1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :    Case No. 1:19-cr-57
                              :
                              :
SANG THANH HUYNH,             :
             Defendant.       :
                              :
------------------------------:
```

PRELIMINARY and DETENTION HEARING

September 12, 2019

Before:   Michael S. Nachmanoff, U.S. Mag. Judge

<u>APPEARANCES:</u>

James L. Trump, Counsel for the United States

Marvin D. Miller, Counsel for the Defendant

The Defendant, Sang Thanh Huynh, in person

INDEX

OPENING STATEMENTS BY:


| WITNESS | EXAMINATION | PAGE |
|---------|-------------|------|
| JOSEPH HOANG | | |
| | DIRECT | 6 |
| | VOIR DIRE | 23 |
| | DIRECT | 25 |
| | CROSS | 28 |


CLOSING ARGUMENTS BY:

| | | |
|---------|-------------|------|
| MR. TRUMP | | 40 |
| MR. MILLER | | 41 |
| MR. TRUMP | | 46 |


COURT'S RULINGS

| | | |
|---------|-------------|------|
| THE COURT | | 46 |

3

1          NOTE:  The case is called to be heard at 2:23 p.m. as

2   follows:

3          THE CLERK:  The United States versus Sang Thanh

4   Huynh, case number 19-cr-57.

5          MR. TRUMP:  Jim Trump on behalf of the United States,

6   Your Honor.

7          THE COURT:  Good afternoon, Mr. Trump.

8          Good afternoon, Mr. Huynh.

9          THE DEFENDANT:  Good morning, Your Honor.  Or good

10  afternoon, Your Honor.

11         MR. MILLER:  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon, Mr. Miller.

13         This matter was continued for a detention hearing.

14  Are the --

15         MR. MILLER:  May I have just a minute, Your Honor?

16         THE COURT:  You may.

17         MR. MILLER:  Thank you, Your Honor.

18         THE COURT:  Are the parties ready to proceed?

19         MR. MILLER:  Yes, Your Honor.

20         THE COURT:  And have you received a copy of the

21  Pretrial Services report which appears to have been prepared in

22  the Central District of California?

23         MR. MILLER:  Yes, Your Honor.

24         MR. TRUMP:  Yes, Your Honor.

25         THE COURT:  Are there any changes, additions,

4

1    corrections you wish to make, Mr. Trump, on behalf of the

2    Government?

3            MR. MILLER:  No, Your Honor.

4            THE COURT:  Mr. Miller, are there any changes,

5    additions, corrections that you wish to make?

6            MR. MILLER:  Just a couple points, if Your Honor

7    please.

8            As I said in the memo, I'm sorry I wasn't able to get

9    it out earlier, but I brought a paper copy because I didn't

10   think the efile would have circulated.

11           THE COURT:  I have a copy.  Thank you.

12           MR. MILLER:  He did have his own business, which was

13   the Vape in Paradise from '13 until '18.  Our understanding is

14   that he has -- his mother lives in Falls Church with his

15   eight-year-old brother.  He has an older brother that lives in

16   the area, which is where we would ask that he be released to.

17   That information we couldn't verify because his mother and my

18   linguistic capacities don't allow that because I don't speak

19   her language, which is Vietnamese, and the other brother

20   happens to be away at this time.  He wasn't sitting around

21   waiting for this to happen.  So I -- but I have contacted other

22   family to verify that.

23           And then the only other thing I would want to make

24   comment on, the record that's contained in the report.  That

25   could be, I guess, by way of argument.

5

1          And then I have another proffer to make about a way

2    to secure his compliance with conditions of release if the

3    Court were to set them.

4          But that's all we have about the report itself at

5    this point.

6          THE COURT:  Well, let's do it one step at a time.

7          MR. MILLER:  Yes, Your Honor.

8          THE COURT:  There are criminal convictions that are

9    referenced in the Pretrial Services report.  Are there issues

10   with regard to those convictions and the record as it's laid

11   out that you disagree with or that you want to clarify in some

12   way?

13         MR. MILLER:  I may want to clarify one.  For example,

14   Your Honor, when it references the assault and battery in D.C.,

15   January 27, 2017 -- let me see what page that is.

16         THE COURT:  Page 6.

17         MR. MILLER:  6, yes, Your Honor.  That was a bar

18   fight.  And the fugitive status was because he wasn't arrested,

19   he left the area.  The warrant came afterwards.

20         And so, fugitive status, it's not like he was charged

21   and ran away.  I mean, he came back here, and I would -- I

22   think it's significant that it was six months unsupervised

23   probation, which is consistent with the fact that it was a bar

24   fight.  Though that's not recounted in the -- in the record

25   itself.

J. Hoang - Direct

6

1           And the fugitive status was he was -- it's not like

2    he was arrested and then left.  He was a fugitive, which is the

3    status they give to anybody when a warrant comes out and

4    they're not found, they put that in the status, and then they

5    get them and bring them back.

6           THE COURT:  Okay.  Is there anything else with regard

7    to the criminal record?

8           MR. MILLER:  Nothing other than what we would present

9    in argument, Judge.

10          THE COURT:  Okay.  Does the Government wish to

11   present any evidence with regard to detention?

12          MR. TRUMP:  Yes, Your Honor.  Special Agent Hoang.

13          NOTE:  The witness is sworn.

14          JOSEPH HOANG, called by counsel for the United

15   States, first being duly sworn, testifies and states:

16       DIRECT EXAMINATION

17   BY MR. TRUMP:

18   Q.   Would you please state your name.

19   A.   Joseph Hoang.

20   Q.   Would you spell your last name, please.

21   A.   H-o-a-n-g.

22   Q.   How are you employed?

23   A.   I'm employed as a special agent with the FBI.

24   Q.   And how long have you been with the FBI?

25   A.   Since December 2010.

1  Q.   And what is your current assignment?

2  A.   I work at the Northern Virginia agent -- resident agency

3  on an organized crime squad.

4  Q.   Does that include gang activity?

5  A.   Yes, it does.

6  Q.   Have you been the -- one of the case agents on an

7  investigation involving a gang by the name of the Reccless

8  Tigers?

9  A.   Yes, I am.

10  Q.   Prior to that, did you also investigate other Northern

11  Virginia gangs?

12  A.   Yes, I did.

13  Q.   Did that include a gang known as DF or Dragon Family?

14  A.   Yes, it did.

15  Q.   And also ADF, or Asian Dragon Family?

16  A.   Yes, it did.

17  Q.   Are you familiar with the defendant?

18  A.   Yes, I am.

19  Q.   And do you recognize him?

20  A.   Yes, I do.

21  Q.   How is it that you recognize the defendant?

22  A.   I recognize him because on the Dragon Family case, he's a

23  nephew of the primary target at that time.  He was captured on

24  TIII intercepts at that time also.

25  Q.   And when was that?

J. Hoang - Direct

8

1  A.    2013.

2  Q.    Have you seen photos of him as well?

3  A.    Yes, I have.

4  Q.    Where was he arrested most recently?

5  A.    He was arrested in Corona, California.

6  Q.    And by whom?

7  A.    By the FBI.

8  Q.    Where was he living at the time?

9  A.    He was living with a friend.

10  Q.    Was he living under his own name in terms of any rental

11  agreement, lease agreement, or otherwise?

12  A.    No, he was not.

13  Q.    Was he driving a vehicle?

14  A.    Yes, he was.

15  Q.    Was that vehicle registered in his name?

16  A.    No, it was not.

17  Q.    In whose name was it registered?

18  A.    A Mr. Hong Nguyen.

19  Q.    Are you familiar with that name?

20  A.    Yes, I am.

21  Q.    And why is that?

22  A.    The same person also rented a condominium at the Mosaic

23  District for Mr. Sang Huynh too.

24  Q.    And the Mosaic District is where?

25  A.    Here in Virginia.

J. Hoang - Direct

9

1   Q.   So he was driving a car in California registered to an

2   individual from Virginia?

3   A.   Correct.

4   Q.   And that apartment in the Mosaic, when was that?

5   A.   That was August of last year.

6   Q.   And based on your investigation, what was that apartment

7   used for?

8   A.   To accept packages, drugs, parties, meetings.

9   Q.   Have you seen some -- or have you identified for today's

10  hearing some photographs?

11  A.   Yes, sir.

12  Q.   I would like to pass to the Court and the witness -- can

13  we have these marked as Exhibit 1 for identification?

14          THE COURT:  You may.

15          MR. TRUMP:  And I provided counsel a copy of these

16  yesterday, I believe.

17  BY MR. TRUMP: (Continuing)

18  Q.   Are you familiar with these photographs?

19  A.   Yes, I am.

20  Q.   And where -- where did they come from?

21  A.   Mr. Sang Huynh's Snapchat account.

22          MR. MILLER:  I'm sorry, who did you say?

23          THE WITNESS:  Mr. Huynh's Snapchat account.

24  BY MR. TRUMP: (Continuing)

25  Q.   And that's a social media platform?

J. Hoang - Direct

10

1   A.   Correct.

2   Q.   And the first photograph, who is depicted in that

3   photograph?

4   A.   Mr. Huynh.

5   Q.   How do you know that?

6   A.   Through his tattoos, the necklaces, the Rolex -- and the

7   Rolex he wears.

8   Q.   And what is depicted in that photograph?

9   A.   A lot of marijuana, cough syrup, money, the Tiger emblem,

10  guns, and Hennessy.

11  Q.   Now, there is a handwritten date on this photograph.  What

12  is that?

13  A.   That's the date the photograph was posted.

14  Q.   Posted on Snapchat?

15  A.   Correct.

16  Q.   The second photograph, what is depicted there?

17  A.   That's Mr. Huynh holding a gun.

18  Q.   And these are some of the same necklaces that are in the

19  first photograph?

20  A.   Correct.

21  Q.   And he is holding what?

22  A.   A handgun.

23  Q.   And what is the date on the top?

24  A.   Mine's scored out.

25  Q.   And that's the date posted on Snapchat?

1   A.   Correct.

2   Q.   The third photograph, and what is that?

3   A.   That's Mr. Huynh holding a handgun.

4   Q.   And again, how do you know that's him?

5   A.   The tattoo.

6   Q.   And the date is the date posted on Snapchat?

7   A.   Correct.

8   Q.   The next photograph, number 4 in the series, what is that?

9   A.   That's Mr. Huynh with a lot of Reccless Tigers members.

10  Q.   And where is he in the photograph, for the Court?

11  A.   He's right in the middle.

12  Q.   Standing right behind him, who is that?

13  A.   Mr. Richard Pak.

14  Q.   Is he indicted in this case?

15  A.   Yes, he is.

16  Q.   And to the right as you're facing the photograph, who is

17  that?

18  A.   Mr. Pai.

19  Q.   Another Reccless Tiger?

20  A.   Yes, he is.

21  Q.   And the bottom left, who is that?

22  A.   Young Yoo.

23  Q.   Is he a defendant in this case?

24  A.   Yes, he is.

25  Q.   Are there any other defendants in this case depicted in

1    this photograph?

2    A.    Yes, there is.

3    Q.    Would you point them out to the Court.

4    A.    So looking at the photo, to the left you have Starter, Kyu

5    Wa Hong.  And right next to him is David Nguyen, also known as

6    DD.

7    Q.    Starting to the left, YG or Young Yoo, what is he doing

8    with his hand?

9    A.    He's doing the Reccless Tigers gang symbol.

10   Q.    And above the defendant, Richard Pak, what is he doing?

11   A.    Richard Pak, the same thing, Reccless Tigers gang symbol.

12   Q.    And are all the other gang signals Reccless Tiger signals

13   in this photograph?

14   A.    Yes, sir.

15   Q.    And the last photograph, what is that?

16   A.    It's Mr. Huynh with other Reccless Tigers and Asian Boyz

17   gang members.

18   Q.    And who is standing to the left as you're facing the

19   photograph?

20   A.    That's Cee Lee, also known as Spade.

21   Q.    And as you're facing the photograph, who is to the right?

22   A.    To the right?  I do not know that person.

23   Q.    What gang signals are depicted in this photograph?

24   A.    So in the middle, that's the Asian Boyz gang symbol.

25   Right behind it is the Reccless Tiger gang symbol.  And the

J. Hoang - Direct

13

```
 1    person with the face shaded out, that's Tony Minh Le, also

 2    known as Tiger, doing the Westside gang symbol.

 3    Q.   And who are the Asian Boyz?

 4    A.   The Asian Boyz is Spade and also Mr. Huynh.

 5    Q.   Where are they primarily located?

 6    A.   California.

 7    Q.   And what is there affiliation with the Reccless Tigers?

 8    A.   They-- the Reccless Tigers is a subset of the Asian Boyz.

 9    Q.   And the robe that is being worn by Tony Le?

10    A.   Versace robe.

11    Q.   What is the significance of a Versace robe?

12    A.   It shows the hierarchy in the gang.  Only the higher

13    members get to wear the Versace robe.

14    Q.   And is that sort of a gang protocol for the Reccless

15    Tigers, Versace merchandise and paraphernalia?

16    A.   Correct.

17             MR. TRUMP:  We would move these into evidence for

18    purposes of the hearing, Your Honor.

19             THE COURT:  Any objection?

20             MR. MILLER:  Not for this hearing only.

21             THE COURT:  They will be admitted.

22    BY MR. TRUMP: (Continuing)

23    Q.   Did the defendant have prior gang affiliation before the

24    Reccless Tigers and the Asian Boyz?

25    A.   Yes, he did.
```

J. Hoang - Direct

1  Q.   And what gang was that?

2  A.   His uncle was part of DF.  He was part of ADF, that

3  historically worked for DF.  And then when he got kicked out of

4  ADF, he started his own gang called SOG, Sons of Guan Yu.  And

5  then he left the area, went to California, linked up with the

6  Asian Boyz, and then came back as a Reccless Tiger/Asian Boy.

7  Q.   Getting back to his uncle, who was his uncle?

8  A.   Phi Van Nguyen.

9  Q.   And his uncle's brother?

10 A.   Phuoc Nguyen.

11 Q.   And what happened to Phuoc Nguyen?

12 A.   Phuoc Nguyen was shot and killed and at the Eden Center

13 September 13, 2014.

14 Q.   What was -- were Phi Nguyen and Phuoc Nguyen involved in

15 drug trafficking?

16 A.   Yes, they were.

17 Q.   And what type of drug trafficking?

18 A.   Phi Nguyen ran a poly drug organization.  He was into

19 selling Molly and cocaine.  He also got marijuana that he gave

20 to Mr. Huynh and his younger brother Phuoc to resell.

21 Q.   And was Phi Nguyen prosecuted in this court?

22 A.   Yes, he was.

23 Q.   Did he plead guilty?

24 A.   Yes, he did.

25 Q.   What was Phuoc Nguyen's role?

15

1    A.   Phuoc Nguyen at that time was selling marijuana on behalf

2    of his brother.

3    Q.   Are you familiar with an incident or May 22, 2017?

4    A.   Yes, I am.

5    Q.   What happened on May 22 of 2017?

6    A.   In May 2017 Mr. Huynh and his younger brother got into a

7    fight with a rival gang member, the guy's name was Michael

8    Francis Mill.

9    Q.   And what's his younger brother's name?

10   A.   Johnson.

11   Q.   And do you believe that was the same person counsel was

12   talking about previously?

13   A.   Yes.

14   Q.   And what happened?

15   A.   They beat up this rival gang member, and then they left

16   the area.

17   Q.   And where did that take place?

18   A.   At the Eden Center.

19   Q.   Are you familiar with an incident that occurred on

20   August 19, 2011?

21   A.   August 19, 2011?  Yes, I am.

22   Q.   And did that involve Fairfax County police?

23   A.   Yes, it did.

24   Q.   And what happened on August 19, 2011?

25   A.   During a traffic stop Mr. Thanh -- Mr. Huynh took off

1    running and resisted arrest, and assaulted the police officer.

2    Q.    And who was that police officer?

3    A.    At that time Police Officer Brian Byerson.

4    Q.    And just coincidentally, is he also involved in this case?

5    A.    Yes, he is.

6    Q.    Is he assigned to Fairfax homicide?

7    A.    Yes, he is.

8    Q.    Are you familiar with a concert in April of 2017?

9    A.    Yes.

10   Q.    And where was that?

11   A.    That was at The Ara.

12   Q.    And who was performing at that concert?

13   A.    Mr. Joseph Lamborn, also known as Trigga.

14   Q.    Has he been charged in this case?

15   A.    Yes, he has.

16   Q.    What happened at the concert?

17   A.    Reccless Tigers was there.  A lot of ADF members were

18   there.  And there was a fight where someone was shot by a

19   Reccless Tigers member.

20   Q.    Has anyone been prosecuted for that?

21   A.    No.

22   Q.    Was the defendant present?

23   A.    Yes, he was.

24   Q.    How do you know that?

25   A.    Through multiple interviews, other people told us he was

1    there.

2    Q.    Was there also an incident at a place called The Block?

3    A.    Yes.

4    Q.    When was that?

5    A.    The day right after The Ara.

6    Q.    In April of 2017?

7    A.    Correct.

8    Q.    Where is The Block located?

9    A.    In Annandale.

10   Q.    And what happened at The Block?

11   A.    A lot of Reccless Tigers members were there celebrating.

12   They got in an altercation with another group.  There is video

13   of Mr. Huynh striking people with chairs and other Reccless

14   Tigers members hitting other people with chairs.  Other members

15   pulled out guns on individuals there too.

16   Q.    Were any guns discharged?

17   A.    At that -- yes.

18   Q.    Was anyone injured?

19   A.    No.

20   Q.    Are you familiar with an incident at a tattoo parlor in

21   December of 2017?

22   A.    Yes, I am.

23   Q.    What happened on December 27, 2017, at the tattoo parlor?

24   A.    On that day Mr. Huynh was with three other Reccless Tigers

25   members, Douglas Martinez, Mr. Pai, and Mr. Young Yoo.  Another

J. Hoang - Direct

18

1    Reccless Tigers member, Peter Le, came with a bat to fight

2    them.  They subsequently took the bat away from him and beat

3    Mr. Peter Le up.

4    Q.   And how do you know that Mr. Huynh was there?

5    A.   We have him on surveillance camera.

6    Q.   Was there a stabbing on December 18 of 2017?

7    A.   Yes, there was.

8    Q.   Who was the victim of the stabbing?

9    A.   The victim was Nico Nguyen.

10   Q.   And what happened?

11   A.   Nico Nguyen was standing outside of Pho Anh Duong.  From

12   reports, he said a black Mercedes with temporary tags came up,

13   four individuals jumped out, he believed to be Asian, but they

14   had ski masks on, they struck him with a baton and a stick, and

15   somebody stabbed him four times.

16   Q.   Was Mr. Huynh involved with that?

17   A.   We believe so.

18   Q.   And how is -- why is it that you believe so?

19   A.   Because a week after that incident was the Way of Ink

20   fight.  We saw him drive to the Way of Ink in the 2016 black

21   Mercedes E class with temporary tags.

22   Q.   Was anyone arrested in that incident?

23   A.   No one was.

24   Q.   August 14, 2018, are you familiar with an incident on that

25   date?

J. Hoang - Direct

19

1    A.    Yes, I am.

2    Q.    What happened on that date?

3    A.    Mr. Huynh was shot that day, two times.

4    Q.    And tell us what happened.

5    A.    He was with a friend.  Accordingly, his friend got shot in

6    the leg.  He got shot in the groin and the left chest.

7    Q.    Do you have any information as to why he was shot?

8    A.    No, I do not.

9    Q.    Now, have you had the opportunity to review -- have you

10   and other agents had the opportunity to review bank records

11   relating to this defendant?

12   A.    Yes.

13   Q.    And just in very summary form, what do the bank records

14   indicate?

15   A.    The bank records show thousands and thousands, in the

16   hundreds of thousands, close to a million, money wired from Mr.

17   Huynh's accounts from here to California.

18   Q.    What is the significance of California as it relates to

19   the drug trafficking charges in this case?

20   A.    California is where the gang gets all their marijuana

21   from.

22   Q.    Now, were these transactions structured?

23   A.    Yes.

24   Q.    Approximately what was the -- what was the regular amount

25   of deposits in this area that were then transferred to

J. Hoang - Direct

20

1   California?

2   A.   It fluctuated from 6,000 to 9,000, 9,500.

3   Q.   But never above 10,000?

4   A.   No.

5   Q.   Were they cash?

6   A.   Yes.

7   Q.   And then the money was withdrawn in California?

8   A.   Correct.

9   Q.   And you stated the total was over a million dollars?

10  A.   Yes.

11  Q.   Over what period of time?

12  A.   I want to say two to three years.

13  Q.   Now, as a result of the -- well, as a result of the

14  defendant's arrest in Washington, D.C., was evidence seized?

15  A.   Yes, there was.

16  Q.   And what evidence was seized?

17  A.   His cell phone.

18  Q.   And from that cell phone, was -- were there podcasts?

19  A.   Yes, there was.

20  Q.   And have you listened to them?

21  A.   Yes, I have.

22  Q.   Is there one in particular you could bring to the

23  attention of the Court today?

24  A.   Yes, I am.

25  Q.   And would you describe the context of the podcast.

A.   The podcast is Mr. Huynh talking to the public, talking

about the gang.  The history of the gang.  The beef with ADF.

How his uncle died.  How he -- he's part of the Reccless

Tigers/Asian Boyz, and that he will never let this beef go

away.

MR. TRUMP:  With the Court's permission, if we could,

we would like to play a portion of that because we think it

relates to the detention issues before the Court.

THE COURT:  Any objection?

MR. MILLER:  I haven't heard it before or aware of

it.  So I don't know whether I would want to hear all of it or

just a portion.

MR. TRUMP:  We will certainly make all of it

available to Mr. Miller.

THE COURT:  Well, you may proceed.

And if you have an objection, you can lodge it as you

-- as we hear it.  And we can address then how you want to

address that.

MR. MILLER:  Could I voir dire the witness about that

one piece before it's played?

THE COURT:  Okay.

MR. TRUMP:  Judge, there is no jury.

THE COURT:  What are you concerned about?

MR. MILLER:  Well, the -- I want to ask him questions

about it to be sure that it's the appropriate one to be played

1    for the Court before the Court hears it.

2            THE COURT:  Well, I'll let you ask questions, to ask

3    him where he obtained the tape and how he identifies who it is.

4            MR. MILLER:  Yes, sir.

5            THE COURT:  If that's what you want to do.

6            MR. MILLER:  You presaged my questions, Your Honor.

7            THE COURT:  Very good.  If you -- or, Mr. Trump, you

8    can lay the foundation for where this comes from.

9            MR. TRUMP:  I was going to ask him a few predicate

10   questions.

11           THE COURT:  Go ahead.  I'll reserve my ruling on

12   whether it can be played.

13           MR. MILLER:  Thank you.

14   BY MR. TRUMP: (Continuing)

15   Q.   Now, you mentioned a phone that was seized by Metropolitan

16   Police.  Was this the defendant's phone?

17   A.   Yes, it was.

18   Q.   And have you reviewed the information from the phone?

19   A.   Yes, I have.

20   Q.   And how do you know it was the defendant's phone?

21   A.   That was the phone number that he gave Metropolitan

22   police, and that's the phone they had that day.  That was the

23   phone they got the search warrant for too.

24   Q.   Does the podcast also contain video?

25   A.   Yes, it does.

J. Hoang - Voir Dire

23

1   Q.   And what does the video depict?

2   A.   Him in it.

3            MR. TRUMP:  With that, I don't know if Mr. Miller has

4   any additional questions before we --

5            THE COURT:  Are you moving to have it played at this

6   time, Mr. Trump?

7            MR. TRUMP:  I was going to ask him to play a very

8   brief portion of it.

9            THE COURT:  And do you have an objection with regard

10  to foundation at this time?

11           MR. MILLER:  Yes, Your Honor.

12           THE COURT:  And what is your objection?

13           MR. MILLER:  Well, can I ask him some foundations to

14  raise with you, if you don't mind?  It's a Riley foundation.

15           THE COURT:  I'm sorry?

16           MR. MILLER:  Riley versus California, how they got

17  into the phone.

18           THE COURT:  Well, you can ask the question, but I

19  think that's been answered, which is they sought a warrant.

20           MR. MILLER:  I haven't heard that.

21           THE COURT:  You may ask him that question right now.

22           MR. MILLER:  Thank you.  All right.

23       VOIR DIRE EXAMINATION

24  BY MR. MILLER:

25  Q.   How did the D.C. police come into possession of the phone?

J. Hoang - Voir Dire

24

1    A.    They got it the day he was shot.

2    Q.    Okay.  How did they get it the day he was shot?

3    A.    He was the victim, and they collected it as evidence.

4    Q.    Okay.  And then how did they get into the content of the

5    phone?

6    A.    They got a search warrant September 11, 2018.

7    Q.    From which court?

8    A.    From D.C. court.

9    Q.    Okay.  And did you acquire possession of the phone?

10   A.    No, I did not.

11   Q.    Okay.  How is it you acquired the content of the phone?

12   A.    I was given a working copy of the content of the phone.

13   Q.    By --

14   A.    The D.C. detective.

15   Q.    Okay.  And you executed no process, that was just an

16   exchange between the two of you, so to speak?

17   A.    Correct.

18          MR. MILLER:  Okay.  All right.  I'll save the rest

19   for cross-examination, Your Honor.

20          THE COURT:  Are you still interposing an objection,

21   or is your objection withdrawn?

22          MR. MILLER:  I think that there is still not an

23   adequate foundation to connect it, or whatever is said on it,

24   to him.

25          THE COURT:  I will overrule your objection.  You may

J. Hoang - Voir Dire

25

```
1   play the tape.

2        DIRECT EXAMINATION

3   BY MR. TRUMP: (Continuing)

4   Q.   Now, how long is this particular podcast?

5   A.   Roughly 18 minutes.

6   Q.   And the portion you wish to play concerns what?

7   A.   Mr. Huynh talking about the gang, how he would never let

8   the beef between ADF go away.

9   Q.   So this is how he would settle whatever beef there is

10  between the gangs?

11           MR. MILLER:  Actually, I object to the leading

12  questions, Your Honor.  He can just -- it speaks for whatever

13  it says.

14           THE COURT:  Please stand if you are going to object,

15  Mr. Miller.

16           MR. MILLER:  I'm sorry, Your Honor.  He's suggesting

17  what he wants the witness to say to the Court.  I think there

18  is --

19           THE COURT:  Sustained.  You may rephrase the

20  question.

21  BY MR. TRUMP: (Continuing)

22  Q.   What do you believe, or what do you take from the phone as

23  to why you characterize it as "beef"?  What did you mean by

24  beef?

25  A.   A beef --
```

1    MR. MILLER:  He -- excuse me, pardon me, sir.  The

2  last --

3    THE COURT:  Sustained.  He can play the tape and we

4  can listen to it for ourselves.

5    MR. MILLER:  Thank you, Your Honor.

6    MR. TRUMP:  I just wanted him to clarify what he

7  meant by the word "beef" in the context of the tape.

8    THE COURT:  We'll find out.

9  BY MR. TRUMP: (Continuing)

10  Q.   At what portion of the podcast is this?

11  A.   The last two minutes.

12    NOTE:  The audio recording is played.

13  BY MR. TRUMP: (Continuing)

14  Q.   Now, a few additional questions, Agent Hoang.  Counsel

15  filed a motion for a reasonable bond in which he mentions that

16  his mother and two brothers live in this area.

17    During your investigation of the killing of Phuoc,

18  did the defendant's mother have anything to do with that

19  investigation?

20  A.   Yes.

21  Q.   What happened shortly after Phuoc was killed?

22  A.   Shortly after Phuoc was killed, she was telling people at

23  the Eden Center that she was going to send either one of her

24  sons to Guong's nail salon and shoot up the whole family and

25  everybody there because she couldn't let her younger brother

27

1  die like that.

2  Q.   And at the time, it was believed that Gung was responsible

3  for Phuoc's murder?

4  A.   Correct.

5  Q.   Now, the brother you mentioned earlier, does he have any

6  connection to this investigation?

7  A.   Yes, he does.

8  Q.   In what respect?

9  A.   He worked on the marijuana farms in Hayfork, California.

10  Q.   And how do you know that?

11  A.   When we made arrests, we interviewed people, and they told

12  us he was there.

13  Q.   And without naming the other defendant, was there a

14  defendant in this case to whom he's delivered money?

15  A.   Yes, there is.

16  Q.   And when, approximately, was that?

17  A.   That was approximately May of this year.

18  Q.   And how do you want that?

19  A.   We seized that person's phone, and we saw the checkmarks

20  of who he was supposed to pick up money from.

21  Q.   And that was the defendant's brother?

22  A.   Correct.

23  Q.   The Vape in Paradise business, are you familiar with that?

24  A.   Yes, I am.

25  Q.   Where was that located?

J. Hoang - Cross

28

1    A.   That was located on top of Cafe Metro inside the Eden

2    Center.

3    Q.   And what -- what do you know about that business?

4    A.   That's where they sell drugs.  His uncle was selling the

5    cocaine there.  He was dealing there too.  He got that store on

6    top because the previous business there was no longer there.

7    Q.   And have you done record checks with local authorities as

8    well as Virginia authorities to determine whether the defendant

9    had any legitimate business or employment?

10   A.   Yes, I have.

11   Q.   To your knowledge, has he ever had any legitimate

12   employment?

13   A.   No, he has not.

14          MR. TRUMP:  That's all I have, Your Honor.

15          THE COURT:  Thank you.  Cross-examination.

16          MR. MILLER:  Thank you.

17      CROSS-EXAMINATION

18   BY MR. MILLER:

19   Q.   Now, you said that he was picked up on some intercepts

20   with Phi; is that correct?

21   A.   Correct.

22   Q.   Okay.  What do you mean by intercepts?

23   A.   Title III intercepts.

24   Q.   Okay.  And what did he -- what was the nature of the

25   conversation on the Title III intercepts?

1    A.    With Mr. Huynh?

2    Q.    Yes.

3    A.    It was surrounding marijuana, picking up money, in his

4    words "paper," to give back to his uncle.

5    Q.    So he didn't use the word "marijuana," he didn't use the

6    word "money"?

7    A.    Correct.

8    Q.    And your interpretation of the conversation is that that's

9    what he meant?

10   A.    Correct.

11   Q.    Okay.  And he wasn't charged in that case?

12   A.    No, he was not.

13   Q.    And he wasn't charged as a result of the convictions and

14   cooperations in that case either, was he?

15   A.    No, he was not.

16   Q.    Okay.  Now, the photograph with the Guy Fawkes mask, did

17   you know that that was being prepared as an album cover for a

18   gangster rap video?

19   A.    I did not know that.

20   Q.    Okay.  Now, the -- what would you say is his position --

21   do you say is his position in the Reccless Tigers?

22   A.    He's pretty high up there.  We have been told he's a five

23   star general or a lieutenant.

24   Q.    And where did you get that information?

25   A.    DD had told us, David Nguyen had told us that he was a

J. Hoang - Cross

30

1    five star general.  Other cooperators told us that he was high

2    up in the gang too.

3    Q.   Okay.  And his exact precise position isn't known, just

4    that he is high up, is that what you're saying?

5    A.   Correct.

6    Q.   Okay.  And that's from individuals who were cooperating

7    with you in this investigation?

8    A.   I wouldn't say David is cooperating.

9    Q.   I'm sorry?

10   A.   I wouldn't say David Nguyen is cooperating.

11   Q.   Okay.  But you're talking about others?

12   A.   Correct.

13   Q.   All right.  Now, you say that in May of 2017 there was a

14   fight in the Eden Center?

15   A.   Correct.

16   Q.   Okay.  That's not in D.C.?

17   A.   No, that's not.

18   Q.   Okay.  And that's not the D.C. conviction?

19   A.   No, it's not.

20   Q.   Okay.  And was there video of the fight in the Eden

21   Center?

22   A.   No, there was not.

23   Q.   Okay.  So how do you know what happened at the fight on

24   the 22nd of May 2017?

25   A.   Witnesses there identified his mother and him and his

1    brother.

2    Q.    As being present?

3    A.    Correct.

4    Q.    Okay.  Didn't say exactly what they did though, did they?

5    A.    No.

6    Q.    Okay.  So they were present when there was a fight?

7    A.    Yes.  And Detective Ed Lancaster had a telephone

8    conversation with Mr. Huynh afterwards.

9    Q.    Okay.  But he wasn't charged with the Eden fight, was he?

10   A.    No, he was not.

11   Q.    And his mother wasn't charged?

12   A.    No, she was not.

13   Q.    And his brother wasn't charged?

14   A.    No, he was not.

15   Q.    All right.  Now, there was another event that you talked

16   about in August, an August event, 19th of August.  What was

17   that?

18   A.    You're talking about August 2011?

19   Q.    Yes.

20   A.    That was a traffic stop at that time, Police Officer

21   Byerson had made a traffic stop on him, and he assaulted

22   Officer Byerson.

23   Q.    Okay.  And do you know, was that traffic stop caught on a

24   dash cam by the police?

25   A.    I do not know.

1  Q.   Okay.  And you haven't reviewed a dash cam to see what

2  happened?

3  A.   No.

4  Q.   All right.  Now, you say that in April of 2017 at a

5  concert there was a fight?

6  A.   Correct.

7  Q.   He was present?

8  A.   Yes, he was.

9  Q.   Okay.  Do you have video of that?

10  A.   No, I do not.

11  Q.   And so -- and he wasn't charged?

12  A.   No.  No one was charged.

13  Q.   So no one was charged.  And the next day at The Block in

14  Annandale there was a fight?

15  A.   Correct.

16  Q.   And there is no -- he wasn't charged with that event

17  either, was he?

18  A.   No, he was not.

19  Q.   Okay.  And he didn't have any firearm then, did he?

20  A.   Not that I know of.

21  Q.   Okay.  Now, what's the answer then on the 27th of November

22  2017?

23  A.   Repeat that question again, sir.

24  Q.   Yeah.  27 November 2017, you talked about an incident that

25  occurred then.

1    A.    November 20 --

2    Q.    27 -- December 27.

3    A.    December 27.  That was the fight at the Way of Inc.

4    Q.    Okay.  And no one identified him as being present?

5    A.    We have him on video.

6    Q.    You have a video, but you don't have his face?  You said

7    that you believed it was him?

8    A.    No, we have his face on video.

9    Q.    You have a video of him being -- and what did -- what are

10   you saying that he did then?

11   A.    He was beating up Mr. Peter Le.

12   Q.    Do you know why?

13   A.    There was some turmoil within the gang that Mr. Huynh felt

14   Mr. Peter Le disrespected him.

15   Q.    Well, how do you know that?

16   A.    Through interviews with other people.

17   Q.    So other people were telling you what they think was going

18   on between these two guys?

19   A.    Correct.

20   Q.    Okay.  And Peter hasn't said that, has he?

21   A.    No, he has not.

22   Q.    Okay.  So you don't know really -- and those people

23   weren't necessarily there, that was just their opinion about

24   what they thought might be going on, street rumor; isn't that

25   correct?

```
 1   A.   Correct.

 2   Q.   Okay.  There can be a lot of street rumors in groups and

 3   organizations, not all of it's true; isn't that correct?

 4   A.   That's true.

 5   Q.   All right.  Now, you talked about bank records.  How did

 6   you get the bank records?

 7   A.   We got grand jury subpoenas for them.

 8   Q.   All right.  And they showed money being wired to

 9   California; is that correct?

10   A.   Correct.

11   Q.   In the amounts of 6,000, $9,000?

12   A.   Fluctuates, correct.

13   Q.   Right.  Now, wasn't that part of the vaping business?

14   A.   That was part of the vaping business?

15   Q.   Yeah.  Wasn't that money being sent as part of the

16   proceeds from the vaping, Vaping in Paradise, I think it was

17   called?

18   A.   I do not believe so.

19   Q.   You don't believe so, but you don't know?

20   A.   I do not know.

21   Q.   Okay.  No one has told you where the money came from or

22   what it was for?

23   A.   No.

24   Q.   Okay.  Now, you said that his brother worked in marijuana

25   in California.  When was that?
```

1   A.   That was sometime last year.  I do not have the specific
2   date.
3   Q.   Okay.  Which brother was that?
4   A.   That was Johnson.
5   Q.   Johnson?
6   A.   Johnson.
7   Q.   Not Phillip?
8   A.   No.
9   Q.   Okay.  And Phillip is not involved in this stuff?
10  A.   Phillip works at a car dealership, but he has received
11  money from Mr. Huynh.
12  Q.   But do you know why his brother gave him money?
13  A.   I do not know.
14  Q.   Okay.  Have you ever known anybody's brother to give them
15  money?
16  A.   I do.
17  Q.   Okay.  Sisters too?
18  A.   Yes, but not in that amount.
19  Q.   What amount was it?
20  A.   It was high, it was in the thousands of dollars.
21  Q.   Okay.  How do you know?
22  A.   Through the bank records.
23  Q.   Okay.  And do you know why he needed the money?
24  A.   I do not know.
25  Q.   Okay.  Now, Phillip has worked at that dealership for a

1   period of time; isn't that correct?

2   A.   Correct.

3   Q.   All right.  Now, when his brother Johnson was in

4   California, California has legal marijuana; isn't that correct?

5   A.   Correct.

6   Q.   For medical use and for recreational use?

7   A.   Correct.

8   Q.   And there are a lot of legal grow operations in

9   California, aren't there?

10  A.   Correct.

11  Q.   And people go out there and work out there and then they

12  go back to wherever they came from, don't they?

13  A.   Correct.

14  Q.   All right.  Now, you claim that there were statements that

15  his mother made.  Do you have a recording of those statements?

16  A.   No recording, sir.

17  Q.   Okay.  So that's street rumor?

18  A.   Those are interviews of confidential informants.

19  Q.   Right.  Talking about stream rumor?

20  A.   If you say so.

21  Q.   Well, you've debriefed people before, I dare say, right?

22  Okay.  So you ask them, where were you?  What did you see?

23  What did you hear?  What do you know?  What's going on?  What's

24  the word on the street about this, that, or the other?  You ask

25  questions like that during a debriefing, don't you?

1    A.    Yes.

2    Q.    Okay.  And sometimes you get things that are accurate and

3    sometimes you get things that are not accurate?

4    A.    Correct.

5    Q.    Okay.  And that's not been verified by anyone, by any

6    video or any audio or anybody saying -- or any admissions;

7    isn't that correct?

8    A.    That's correct.

9    Q.    Okay.  Now, you were talking about checkmarks on

10   somebody's phone about delivery of money?

11   A.    Correct.

12   Q.    All right.  So what do you mean "checkmarks"?

13   A.    The phone that we seized, the individual was known to

14   collect money for the group.

15   Q.    How were they known to collect money for the group?

16   A.    Through interviews, through our investigation, that was

17   the information we had.  And this individual had on the phone

18   places to go to go pick up, and the content of the text

19   conversations with other people.

20   Q.    Okay.  Now, the gang that you're talking about, the --

21   well, the Dragon Family, the Asian Dragon Family, the Reccless

22   Tigers, and so on, they're Northern Virginia?

23   A.    Correct.

24   Q.    Okay.  And you said the Asian Boyz, they're California?

25   A.    Correct.

J. Hoang - Cross

38

1   Q.   And so, the connection that you are claiming is California

2   to here and here to California?

3   A.   The connection came from California to here.

4   Q.   Okay.  Now, you don't have any Title IIIs of him where

5   it's his voice saying anything that is connected to this

6   indictment, do you?

7   A.   No, I do not.

8   Q.   Okay.  And you don't have any Title IIIs of others talking

9   about him and facts related to this indictment?

10  A.   No, I do not.

11  Q.   Okay.  And you don't have any cell phone records that

12  create a chart of him having conversations back and forth with

13  individuals involved in this case for the last two years, do

14  you?

15  A.   We do have cell phone records of him speaking with other

16  Reccless Tigers members.

17  Q.   When?  What year?

18  A.   The past two years.

19  Q.   The past two years.  But you don't know the content?

20  A.   No, we do not.

21  Q.   Okay.  There are gang people that have been in gangs,

22  motorcycle gangs, and not all of them are involved in anything

23  other than just being in the gang; isn't that correct?

24          MR. TRUMP:  Objection, Your Honor.  We're not talking

25  about motorcycle gangs.

1           THE COURT:  Overruled.  You may answer the question

2    if you are able to.

3    BY MR. MILLER: (Continuing)

4    Q.   There are members that have been -- people who have been

5    involved in gangs that weren't involved with criminal activity,

6    they were just a member of the gang?

7    A.   Correct.

8    Q.   Okay.  Hold on just a minute, please.  One second, Your

9    Honor.

10           After his uncle was killed, he didn't go out and

11   shoot anybody, did he?

12   A.   Not that I know of.

13   Q.   Okay.  And when he was shot, you don't -- you're not sure

14   what that was all about, are you?

15   A.   Correct.

16           MR. MILLER:  Okay.  No other questions.

17           THE COURT:  Any redirect?

18           MR. TRUMP:  No, Your Honor.

19           THE COURT:  You may step down.

20           NOTE:  The witness stood down.

21           THE COURT:  Does the Government have any further

22   evidence with regard to detention?

23           MR. TRUMP:  No, Your Honor.

24           THE COURT:  Mr. Miller, does the defense wish to

25   present any evidence with regard to detention?

1          MR. MILLER:  Just a little bit by way of proffer,

2    Your Honor.

3          In the motion there is the second -- there are two

4    letters, the last of which is from James Le Chen and Mike

5    Nguyen in New Jersey.  And I would proffer that the real estate

6    that they wish to offer, that they have over -- or

7    approximately $300,000 worth of equity in it.  There is a

8    single lien from a financial institution on the mortgage that

9    is less than 30 percent of the value.  And that the approximate

10   appraisal value is about $440,000.

11         I don't have all the documents to establish that, but

12   that's my understanding of the appraised value.  This is

13   September, August -- I think in July, June or July of this

14   year.

15         I will then -- I would proffer that to the Court.

16   And then I will use that in my argument about conditions of

17   release.

18         THE COURT:  Very good.  Mr. Trump, I'll hear from you

19   first with regard to argument.

20         MR. TRUMP:  Judge, we submit there are no conditions

21   or combination of conditions that would satisfy the two prongs

22   of the statute, safety and risk of flight.

23         First, this is a presumption case, and the defendant

24   stands charged with an offense for which, if found guilty, he

25   would serve a minimum sentence of ten years.

1          His criminal history is relatively extensive.  While

2   he hasn't served a great deal of time, he does have multiple

3   convictions, including felony convictions for drugs.  I note

4   that he had at least four or five failure to appears, one

5   escape.  And while they were resolved with the underlying

6   cases, he did have one revocation of his -- a prior suspended

7   sentence back in 2014.

8          More importantly, Judge, the defendant has been

9   involved in gang activity for a long time, and a lot of it

10  involved violence.  He has been both a participant, an

11  instigator of violence, as well as a victim of violence.

12         And as we've pointed out, this case and some of the

13  gang activity involved violence.  For example, the concert and

14  the incident the day after, the defendant is on video involved

15  in violent actions.

16         In term of risk of flight, the defendant has handled

17  hundreds of thousands, if not more than, a million dollars in

18  financial transactions.  While Mr. Miller could argue that it's

19  proceeds of his vape business, I highly doubt that.  Structured

20  transactions of cash between here and California were not the

21  proceeds of a legal vape business.

22         For all these reasons, Judge, we ask that the

23  defendant be detained.

24         THE COURT:  Thank you.  Mr. Miller.

25         MR. MILLER:  Yes, Your Honor.

1    While we don't know if they were structured

2    transactions, and we don't know what the source is, we do know

3    he was in business.  And we do know, given the current news,

4    that it's a really big and lucrative business about vaping.

5    And there is all kinds of controversy about its health and all

6    that stuff.  But the key think about that that we know from the

7    news reports is how pervasive it is and how lucrative it is.

8    Insofar as gang activity.  For example, the party at

9    The Block the day after the concert, he was present.  There was

10   no indication he did anything.  Being present isn't enough.

11   The real thing that I would ask the Court to look at

12   is he has a bunch of petty charges.  They are generally old.

13   He's rapping on about his uncle in that audio.  A lot

14   of people vent.  A lot of people not from my generation do

15   everything online and do everything in videos and audio and

16   things like that people would say, but wouldn't necessarily be

17   published and so on.

18   So what we have here is a situation where he has got

19   two friends that are willing to put forward a considerable

20   asset.

21   In the Truong case, which I mention in my memo, which

22   was in this court, and the defendant was accused of being a spy

23   for Vietnam against the United States during the Vietnam war,

24   and what we did was we posted assets with the Court such that

25   the Court would have immediate access to the asset upon

1   violation of a condition of release.

2          And Judge Bryan was the judge.  Justin Williams was

3   the prosecutor.  I was in the case as defense counsel

4   initially.  And Mike Tigar came in, one of the most brilliant

5   lawyers I've ever had the pleasure of working with.  But we

6   created the assets, which I think were bonds and a whole bunch

7   of other things, maybe even some real estate, and put it with

8   the court.

9          We have a significant asset that these people are

10  willing to put forward for him.  It is in New Jersey, but it

11  can be a deed to the court that can be recorded so the court

12  doesn't have to go through any process to access the asset.

13         And the asset in that case -- in this case is

14  greater -- I think it was for -- in U.S. v. Truong, it was like

15  $250,000.  Here it would be around $300,000.

16         If the Court is willing to accept that in principle,

17  he would be living with his brother Phillip who has, as the

18  agent said, straight guy, works in the car dealership.  He

19  would have available some employment at a nail salon in

20  Northern Virginia.

21         So what we are asking the Court to do is we don't

22  really have any convictions for flight or convictions for

23  fugitive status where he was gone away, and people said this is

24  really bad, you're going to get ten days of contempt, or you're

25  going to get 30 days as sometimes happens in Fairfax where a

1    lot of this stuff happened for people that just don't show up.

2    People miss dates, they get FTAs against them.  And then if

3    it's a really bad situation, the court does something about it.

4          But you will notice that they are not that category

5    because even the D.C. assault where he got the six months

6    unsupervised probation, he was out after they found him and he

7    came back here and they resolved the case.

8          We don't have him on any wiretaps.  We have a lot of

9    street rumor.  We don't have videos of him involved in drug

10   activity.

11         So our situation is where we can give the Court a

12   really substantial asset, these people are willing to risk

13   it -- it's not a small thing.  It can be deeded to the court.

14   Now, there would have to be, obviously, a title search.  We'd

15   would have to provide, in addition to the title search, the

16   bank loan information.  That has been requested.  But as

17   anybody who has gotten to the point of ever having a house

18   knows, getting them to get the paperwork and get it out, it

19   doesn't happen in a day.

20         And today is Friday.  We were in court yesterday.  I

21   learned about this on Wednesday.  I got retained yesterday

22   morning.  The requests were made, but it's going to take awhile

23   for the paperwork to happen.  And of course, nothing would

24   happen to him until everything was present to satisfy the Court

25   about the value, about the clean title, and that there would be

1    set up a deed of the interest of the owners to the court.

2            Now, it would have to be, of course, recorded in New

3    Jersey and have to be verified and recorded that it was

4    available to the court without anything to happen.  It's not

5    like we would do a pledge.  We would actually do the paperwork

6    like we did in the Truong case to vest it in the court.

7            And then in that case, when everything was over, it

8    took I think two weeks to get it so it could all be released

9    through the Clerk's Office.

10            But we would propose to do all of that in this case.

11    And that that is not ordinary, but it is permissible and the

12    rules allow it.

13            And so, if someone is willing to put that much of a

14    stake in the Court's hand to assure his compliance, then that

15    is a more than reasonable basis, with electronic GPS detention,

16    to assure where he'll be, when he'll be under house arrest.

17    And for someone who is not affiliated with any of the activity

18    in this case -- because other than the relationship -- and that

19    would put him in a position different than others that have

20    come before the Court, and would allow him to be able to have

21    this Court have assurance that he would comply with the

22    conditions set.

23            THE COURT:  Thank you.

24            MR. MILLER:  Yes, Your Honor.

25            THE COURT:  Does the Government wish to be heard?

46

1          MR. TRUMP:  Your Honor, I don't know if the Court is

2     even in a position to take a deed of property as bond.

3          But property offered by a third party where we know

4     nothing about the relationship between the third party and the

5     defendant, property with very little equity compared to the

6     type of proceeds that have been involved in this case, I don't

7     think is any surety at all.

8          THE COURT:  Am I correct that the Bail Reform Act

9     that governs detention in this case was passed after the

10    Truong/Humphrey case that you've referred to, Mr. Miller?

11         MR. MILLER:  Yes, it was.  But --

12         THE COURT:  And I would note, simply for the record,

13    and it does not count against you at all, that Frank Dunham was

14    one of the lead counsel in that case.

15         MR. MILLER:  Yes, he was.  He and I had quite an

16    interesting set-to right when David was brought up for the Rule

17    5 hearing.  Justin intervened and calmed both of us down.

18         That's another story.  That is a good story, but

19    that's not -- I'll mention that to you sometime.

20         But the Bail Reform Act allows any and all kinds of

21    conditions and terms.  And is even broader than the Act before

22    because of that catchall, which basically allows anything the

23    Court wants as a condition.  And that Act expands past what was

24    available before.

25         THE COURT:  Thank you.  This matter comes before the

1    Court on defendant's request for release.  And I've listened

2    carefully to the arguments of counsel, and considered the

3    information in the Pretrial Services report, and I've also

4    taken into consideration the evidence presented by the special

5    agent, as well as the allegations in the indictment.

6         This is a presumption case, and that is a difference

7    between the Bail Reform Act of today and the way in which bond

8    was imposed prior.  It is not dispositive, and a presumption

9    can be rebutted, but the nature of the offense in this case has

10   to be taken into account.

11        And the question is whether or not the information

12   that has been presented by defense counsel, including posting a

13   secured bond in the form of a deed of trust, along with the

14   other proposals, are sufficient to allow the Court to fashion

15   conditions that would address both the danger to the community

16   and his risk of flight in this case.

17        I find that there are no conditions or combination of

18   conditions that can address both of those issues.  This is a

19   serious case.  It involves serious allegations of drug

20   trafficking.  And it involves the allegations of a gang, which

21   there is compelling evidence this defendant has been a member

22   of, along with other gangs that have engaged both in illegal

23   conduct and violent conduct.

24        It is also clear, based on the evidence before the

25   Court, in Mr. Huynh's criminal record, that he himself has

48

1    engaged in numerous acts of violence, including an assault on a

2    police officer, amongst many other allegations and evidence of

3    violence.

4            I find that a secured bond and the family's support,

5    while admirable, cannot sufficiently protect against the danger

6    to the community of the defendant's release.

7            I also find that he poses a risk of flight based on

8    his criminal history, and based on the charges in this case,

9    and his access to significant financial transactions.

10           I would note for the record that he himself disclosed

11   to Pretrial Services that the vape business was closed as it

12   was not bringing in enough revenue.  And so, that seems to be

13   at odds with the argument that the enormous amounts of

14   financial transactions were based on legitimate earnings.

15           So for all these reasons, the testimony provided and

16   the information in the Pretrial Services report, I find that

17   the presumption has not been rebutted, and I find that the

18   defendant poses both a danger to the community and a risk of

19   flight.

20           He will be returned to the custody of the Marshals

21   until further action in this case.

22           Court will be in recess.

23           NOTE:  The hearing concluded at 3:03 p.m.

24   -------------------------------------------------

25

1

2              C E R T I F I C A T E   of   T R A N S C R I P T I O N

3

4

5         I hereby certify that the foregoing is a true and

6    accurate transcript that was typed by me from the recording

7    provided by the court.  Any errors or omissions are due to the

8    inability of the undersigned to hear or understand said

9    recording.

10

11        Further, that I am neither counsel for, related to,

12   nor employed by any of the parties to the above-styled action,

13   and that I am not financially or otherwise interested in the

14   outcome of the above-styled action.

15

16

17

18

19

20                          /s/ Norman B. Linnell

21                        Norman B. Linnell

22                        Court Reporter - USDC/EDVA

23

24

25