1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :   Case No. 1:19-cr-57
                              :
                              :
SANG THANH HUYNH,             :
             Defendant.       :
                              :
------------------------------:
```

MOTIONS HEARING

October 4, 2019

Before:   Liam O'Grady, USDC Judge

<u>APPEARANCES:</u>

Carina A. Cuellar, Counsel for the United States

Marvin D. Miller, Counsel for the Defendant

The Defendant, Sang T. Huynh, in person

INDEX

OPENING ARGUMENTS BY:

  MR. MILLER                                   4

  MS. CUELLAR                                 8

  MR. MILLER                                 10

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| JOSEPH HOANG | | |
| | DIRECT | 11 |
| | CROSS | 16 |
| | REDIRECT | 18 |
| | RECROSS | 19 |

CLOSING ARGUMENTS BY:

  MR. MILLER                                 19

  MS. CUELLAR                               24

  MR. MILLER                                 25

COURT'S RULINGS

  THE COURT                                   26

3

1          THE CLERK:  The Court calls case 1:19-cr-57, the

2    United States of America versus Sang Huynh for a motion

3    hearing.

4          May I have the appearances, please, first for the

5    Government.

6          MS. CUELLAR:  Good morning, Your Honor.  Carina

7    Cuellar on behalf the United States.

8          THE COURT:  All right.

9          MR. MILLER:  Good morning, Your Honor.  Marvin Miller

10   for Mr. Huynh, who is in custody.

11         THE COURT:  All right, Mr. Huynh is now present.

12         Mr. Miller, this is your motion, sir.

13         MR. MILLER:  Yes.

14         THE COURT:  Good morning.

15         MR. MILLER:  Just for the record, I understand the

16   Court's fear of computers and stuff.  We just object to not

17   being allowed to being able to bring in a computer this

18   morning.

19         THE COURT:  Well, if you wanted to bring in a

20   computer, there is a form that you sign, and you have to get

21   the IT section to look at the computer --

22         MR. MILLER:  I know, make sure it's not got a bomb in

23   it, and it's not going to broadcast to CBS.  That's a new

24   policy that I didn't know came into existence.  I was glad to

25   get a copy that you have to go through a magnetometer and have

1   your briefcase screened when you come in because I wasn't aware

2   of that either.

3        THE COURT:  Okay, go on with your motion.

4        MR. MILLER:  But whatever.  This is a motion that

5   needs to be heard de novo, of course, because there is no

6   proper order in the magistrate's proceeding.

7        The statute says in 3142(i)(1), and as interpreted by

8   Salerno, which was Justice Rehnquist's decision on the statute

9   right after it came out, that the judicial officer must include

10  a written finding of fact and a written statement of reasons

11  for decisions to detain.

12       And I am not aware of any order that does that.  I

13  don't know of any facts that were specifically found.  I don't

14  know how the facts were then tied specifically to reasons.  And

15  then all I know is that there was an order with a conclusion,

16  and that order is not sufficient.

17       In that regard, as Justice Rehnquist also said, and

18  this is the Salerno decision at page 751, that -- and at 750

19  and 751, that there is a full-blown adversary hearing, the

20  defendant has the right to cross-examine witnesses, and you do

21  all of that so that the judicial officer hearing the case can

22  make specific findings of fact.  And we don't have that.

23       We have a Government's response that has inaccurate

24  facts and facts that were never presented to the magistrate

25  below either.  And the magistrate, to the extent some of it was

1   presented, made no findings of fact.

2          If you look at page 2, I would ask that the whole

3   thing be stricken.  They say that there was a friend who made

4   statements to an agent.  That's news to me, I know nothing

5   about that in their third bullet point.

6          In the fourth bullet point they talk about a storage

7   facility.  Of course, they left out two important facts.  One

8   of which is the video shows he hasn't been in that facility for

9   well over a year to a year-and-a-half, and they didn't put that

10  in the facts.

11         And they also didn't put into the facts that there

12  were two other people that had full access to the facility.

13  And that wasn't raised below.

14         And there are Bank of America and all that and Naval

15  Credit Union on page 3, or conclusions, and according to

16  Justice Rehnquist, those conclusions would not suffice for a

17  probable cause determination.  And he made it real clear in

18  Leon that you can't give a judge your conclusions.  You have to

19  give a judge facts for probable cause even when the Rules of

20  Evidence don't apply and hearsay is fully admissible.

21         That the suspected drug rip-off, that's their

22  speculation, you can't put -- I'm an agent, let me make a

23  speculation, make a guess, and you take it as true.  They can't

24  do that on their fourth bullet on 3.

25         Their bullet on 4 is a conclusion, therefore.  They

1   have put in no evidence.  There is no witnesses to him getting

2   any drugs at any time in the case where CI so-and-so says, I

3   was present and he received.  Or CI so-and-so plus 2 says, I

4   was present and he distributed.  There is none of that at all.

5          The Snapchat accounts, the videos and stuff like

6   that, remind me of an individual named -- what's his name?  Lud

7   Foe and another one named Caprun who are -- what do you call

8   it, gangster rappers.  Caprun has 36 million viewers and Foe

9   has 20 million viewers of videos that are almost identical to

10  the ones that they showed him, which is what we were going to

11  show you this morning, to show running around with what looks

12  like marijuana, money, guns, and all that stuff.  And 20

13  million and 36 million viewers for a commercial operation and

14  him doing the same kind of thing, doesn't add anything one way

15  or the other to a bail determination.

16         And this new thing about the 2,000 deleted text

17  messages and their speculation about what they are, well, he

18  deleted messages; therefore, we will conclude in a presumption

19  of guilt that they are bad.  That's no basis for that.

20         So the only evidence that you have that we agree

21  about is his criminal record, except there is a

22  misrepresentation in the criminal record.  I object to the fact

23  that in this court, unlike in other courts, you can't keep the

24  Pretrial Services report so you can analyze it, take your time

25  and go over it with your client and make sure that it is

1    correct.  But there are no failure to appear convictions that

2    I'm aware of.  I am not saying he wasn't charged, because he

3    was, but there are no convictions.

4           So we have facts that were never considered below.

5    Facts that have not been subjected to cross-examination.  Facts

6    that are speculation and guesswork.  And that's not a basis,

7    according to Justice Rehnquist when he was first analyzing the

8    Act in the Salerno decisions at pages 750, '51 and '52, nor is

9    it consistent with the Act and the requirements under

10   subsection (i) which requires a specific finding of fact

11   followed by -- using those specifically found facts so we know

12   what they are -- specific reasons, a statement of reasons how

13   the facts support the reasons, and then a conclusion.

14          All we have is a conclusion.  So that's no basis for

15   you to make any review of any magistrate judge's decision

16   because you don't have one.  Or if you do, I've never seen it.

17          So I don't know how the Court wishes to proceed on

18   that part, but --

19          THE COURT:  Well, he's been indicted on a ten-year

20   minimum mandatory offense.

21          MR. MILLER:  That's correct.

22          THE COURT:  There is a presumption that no conditions

23   of bond --

24          MR. MILLER:  That's right.

25          THE COURT:  -- are appropriate.

8

1            MR. MILLER:  Right.  Let me address that.

2            THE COURT:  No, hold on first.  Ms. Cuellar, do you

3    have the agent here?

4            MS. CUELLAR:  I do, Your Honor, but I would like to

5    address a few things that Mr. Miller said to the Court.

6            THE COURT:  Okay.  All right.

7            MS. CUELLAR:  As Your Honor is aware, there have been

8    two detention hearings held for the defendant, one in the

9    Central District of California, Los Angeles, and one here

10   before Magistrate Judge Nachmanoff.  At that hearing a federal

11   agent did testify.  He was subject to cross-examination by Mr.

12   Miller.

13           The only new piece of evidence that is included here

14   is bullet four on page 2 which references the recent search of

15   the facility in California.  The reason why the agent didn't

16   testify to that is because it has happened since that bond

17   hearing.

18           The FBI, and indeed our office, received an anonymous

19   tip that the defendant had this storage facility in California,

20   that it contained guns and drugs.  We established probable

21   cause and sought a search warrant in the Central District of

22   California.

23           Now, at that time, and it's something the agent can

24   testify to, there was an individual who was seeking to come to

25   the facility and to gain access to the facility.  This is, of

1  course, after the defendant had been arrested and brought to

2  our district.  There was a search conducted at the facility,

3  the results of which are described in that bullet.  That is the

4  only new piece of information.

5          Also, Mr. Miller I think has misread the final bullet

6  point.  What it says is the Cellebrite analysis of one of those

7  phones recovered over 2,000 messages.  There is no speculation

8  that there were 2,000 messages deleted that may have contained

9  drug-related texts.  The texts have been recovered.  And based

10 on the review of those messages, they are clearly drug related.

11         I can address more of the facts, but I just think

12 before we call the agent, to be clear, Mr. Miller did subject

13 him to cross-examination.

14         And one of the bullets not put in here that I would

15 bring to the Court's attention is that the agent received

16 permission to bring in electronics before Magistrate Judge

17 Nachmanoff's hearing.  And in that he played two, approximately

18 two minutes of a podcast recovered from the defendant's phone.

19 In that the defendant is speaking entirely, mostly swearing and

20 using racial epithets.

21         In that he describes the entire rise of the gangs of

22 which he is a part of.  And in the final two minutes he

23 describes how he is going to gain revenge for his uncle's

24 murder, and that he holds grudges, and proceeds to talk about

25 if he sees those people, they're going to be in "his sights,"

1   which is clearly a reference to a firearm and sights, Your

2   Honor.  That is something that the judge also heard and is not

3   referred to in this filing.

4            THE COURT:  All right, thank you.

5            Mr. Miller, do you want to respond to that?

6            MR. MILLER:  Yes.  They only played part of the

7   podcast.  Nothing about gang development.  They talked about

8   his anger over his uncle being killed, which was in 2013.

9            And so, nobody has been -- he's not been engaged in

10  any violence with anyone that relates to that.  And this is

11  2019, and it's October already.

12           So he was on a rant.  Years ago you would rant with

13  your friends, you would rant in a bar.  Today people rant with

14  a podcast.  But the proof is in the pudding, and there has been

15  no action.  So the rant is the rant.

16           THE COURT:  Do you want to cross-examine the agent on

17  the seizures made of the storage facility?

18           MR. MILLER:  Well, I would have liked to have had the

19  search warrant for that and --

20           THE COURT:  You've already had -- he had a hearing in

21  California.

22           MR. MILLER:  Right.

23           THE COURT:  You were present, cross-examined the

24  agent before Judge Nachmanoff.  Judge Nachmanoff in his order

25  of detention pending trial found that it was a ten-year minimum

1   mandatory, and that no conditions had been found that would

2   override that presumption.  The defendant has not introduced

3   sufficient evidence to rebut the presumption.  Detention is

4   ordered.

5          He adopted in his finding that the defendant argued

6   for bond.  The Court accepted as factual the information

7   contained in the Pretrial Services report.  A more detailed

8   description of the findings was stated in open court and is

9   available for transcription.

10          So Judge Nachmanoff did what was necessary in making

11   the findings that he did.  I'm not going to revisit -- and

12   having -- your having had the opportunity to cross-examine the

13   agent once on all but the storage facility --

14          MR. MILLER:  I could do that, briefly, if Your Honor

15   please.

16          THE COURT:  Okay.  Ms. Cuellar, call the agent and go

17   over the facility search.

18          MS. CUELLAR:  Yes, Your Honor.  At this time the

19   United States calls Special Agent Joseph Hoang.

20          THE COURT:  All right.  Good morning, sir.  Please

21   come forward and be sworn.

22          NOTE:  The witness is sworn.

23          JOSEPH HOANG, called by counsel for the United

24   States, first being duly sworn, testifies and states:

25          DIRECT EXAMINATION

J. Hoang - Direct

12

```
1    BY MS. CUELLAR:
2    Q.   Good morning.  Can you state your full name for the
3    record.
4    A.   Joseph Hoang.
5    Q.   And can you spell your last name.
6    A.   H-o-a-n-g.
7    Q.   Where are you employed?
8    A.   With the FBI.
9    Q.   What is your position with the FBI?
10   A.   I'm a Special agent with the FBI.
11   Q.   And are you the lead case agent in the investigation of
12   the Reccless Tigers?
13   A.   Yes, I am.
14   Q.   And as part of that investigation, are you familiar with
15   an individual by the name of Sang Huynh?
16   A.   Yes, I am.
17   Q.   And how long have you investigated Mr. Sang Huynh?
18   A.   Since 2013.
19   Q.   And are you familiar with his appearance?
20   A.   Yes, ma'am.
21   Q.   And is he present in the courtroom today?
22   A.   Yes, he is.
23   Q.   Can you please identify him.
24   A.   He is sitting at the table right here in the green
25   jumpsuit.
```

J. Hoang - Direct

13

1          THE COURT:  I'll note the identification of Mr.

2     Huynh.

3     Q.    Now, recently in the investigation of Mr. Huynh, did the

4     FBI obtain a search warrant for a facility in California?

5     A.    Yes, we did.

6     Q.    Approximately when was that search warrant obtained?

7     A.    Approximately two weeks ago.

8     Q.    And where is that storage facility located?

9     A.    In Garden Groove, California.

10    Q.    And how did this storage facility come to the FBI's

11    attention?

12    A.    We actually got two tips.  One that came to the Threat

13    Intake, which was a phone call, an anonymous tip, and another

14    e-mail tip too.

15    Q.    And what was the content of this tip?

16    A.    The content said, there is a person by the name of Sang

17    Huynh that will have a bond hearing today at 2 o'clock.  Do not

18    let him out.  He has a storage facility in Garden Grove.  It

19    gave that address and the unit number.  He has guns and drugs

20    in there.  If you let him go, he will clean it out and

21    disappear.

22    Q.    And what did you do based upon this information?

23    A.    We called the storage unit, found out there was a storage

24    unit under Mr. Huynh's name, and got a grand jury subpoena and

25    all that stuff, and then subsequently got a search warrant.

J. Hoang - Direct

14

1   Q.   And after the search warrant was obtained, did law

2   enforcement conduct a search?

3   A.   Yes, they did.

4   Q.   Were you present for that search?

5   A.   No, I was not.

6   Q.   Have you spoken to the agents who were present?

7   A.   Yes, I have.

8   Q.   And have you reviewed information that was obtained from

9   the search?

10   A.   Yes.

11   Q.   And what did law enforcement seize during the search?

12   A.   An Uzi with a 30-round magazine.  All types of ammo from

13   .222 rounds to 9mm.  Some cocaine, or something that field

14   tested positive for cocaine.  Approximately 50 to 100 pills of

15   Xanax.  A money counter.  A Reccless Tigers T-shirt.  A

16   Strugless T-shirt.  Three cell phones.  Reccless Tigers key

17   chains and business cards.

18   Q.   Were notebooks that appeared to be consistent with being

19   drug --

20            MR. MILLER:  Objection to leading questions, Your

21   Honor.

22            THE COURT:  Overruled.

23   BY MS. CUELLAR: (Continuing)

24   Q.   Were notebooks seized during the search?

25   A.   Yes, two.

1    Q.    And have you physically reviewed those notebooks?

2    A.    Yes, I have.

3    Q.    And how long have you been investigating narcotics

4    offenses?

5    A.    Since 2012.

6    Q.    And during that time, have you reviewed other notebooks

7    seized during searches of drug dealers' residences?

8    A.    Yes, I have.

9    Q.    Now, based on your training and experience, what do these

10   notebooks appear to be?

11   A.    Ledgers, owe sheets.

12   Q.    And what are ledgers and owe sheets?

13   A.    Basically an accounting of who owes what type of money and

14   how much.

15   Q.    And in your review of these notebooks, do you recognize

16   any names?

17   A.    Yes.

18   Q.    And are any of these individuals also indicted in the same

19   indictment as the defendant?

20   A.    Yes.

21   Q.    Do you remember any of those names here today when you

22   testify?

23   A.    Yes.

24   Q.    And who are those names?

25   A.    Teddy.  Starter.

1  Q.   And who is Teddy?

2  A.   Teddy is Richard Pak.

3  Q.   And who is Starter?

4  A.   Starter is Mr. Hong, last name Hong.

5  Q.   And they are both indicted in this case?

6  A.   Correct.

7  Q.   Now, during that search, was a mask also seized?

8  A.   Correct.

9  Q.   What significance, if any, is there of that mask?

10  A.   We had a social media post with Mr. Huynh in the bathtub

11  wearing an anonymous mask holding guns.  And behind him was

12  marijuana, cough syrup, stacks of money.

13  Q.   And based on your review of the social media post and the

14  mask that was seized, is it the same mask?

15  A.   It is exactly the same mask, yes.

16         MS. CUELLAR:  No further questions, Your Honor.

17         THE COURT:  All right.  Cross-examination.

18      CROSS-EXAMINATION

19  BY MR. MILLER:

20  Q.   You know that the storage facility had a lock that

21  required a key for entry, don't you?

22  A.   Yes.

23  Q.   And you know that no key for entry to that lock was found

24  in his personal property when he was arrested or at his house?

25  A.   That's correct.

J. Hoang - Cross

17

1    Q.   And so, you don't know who has the keys and who would have

2    been able to access that facility and who else might have had

3    keys, do you?

4    A.   That's correct.

5    Q.   And the person that gave this information wasn't anybody

6    working for you that had a history that you knew anything

7    about, it was just an anonymous call, right?

8    A.   That's correct.

9    Q.   And so, it could have been somebody that knows he has a

10   storage facility, doesn't know anything else, and had a grudge

11   against him; isn't that right?

12   A.   Correct.

13   Q.   Okay.  And you don't know who wrote the ledgers or when

14   they were written, do you?

15   A.   No, I do not.

16   Q.   And you don't know when the gun was put in there or who

17   put the gun in there, do you?

18   A.   No, sir.

19   Q.   And you don't know who put the safe in which it was found

20   in there, do you?

21   A.   I do know that.

22   Q.   Who put the safe in?

23   A.   The storage manager, when we were speaking to the storage

24   manager, she recognized this individual.  She said that she

25   thought it was a Korean boy band because five of them came with

1    a flatbed, and she vividly remembered them bringing in the

2    six-foot safe.

3    Q.   All right.  So there were five people that had access to

4    it on that day.  And whether or not he used it or not is not

5    something that you know?

6    A.   Not that I know.

7    Q.   And you can't say that he has been there in the last

8    year-and-a-half?

9    A.   Not that I know of.

10           MR. MILLER:  All right.  No other questions.

11           THE COURT:  All right.  Any redirect?

12           MS. CUELLAR:  Briefly, Your Honor.

13       REDIRECT EXAMINATION

14   BY MS. CUELLAR:

15   Q.   Now, during your investigation of the storage facility,

16   did any other person seek to obtain access to the facility when

17   law enforcement was there?

18   A.   Yes.

19   Q.   Can you describe that for the Court.

20   A.   In September, after Mr. Huynh was arrested, a person

21   called the storage manager and tried to gain access.  Went by

22   the nickname Memo or Mo, is what the manager could remember.

23   They wanted to pay the late fees for it and the asked the

24   manager to cut the lock.  The manager wouldn't do that.

25           MS. CUELLAR:  No further questions, Your Honor.

J. Hoang - Recross

19

1          THE COURT:  Okay.  All right, thank you --

2          MR. MILLER:  Just one brief follow-up.  Just one.

3          THE COURT:  Go ahead.

4     RECROSS-EXAMINATION

5 BY MR. MILLER:

6 Q.   So it was somebody else who was paying the fees, from what

7 you understand from the manager?

8          THE COURT:  No.

9 A.   No.

10          THE COURT:  He stated somebody offered to pay the

11 late fee.

12 Q.   Okay.  But you don't know who was paying the fees?

13 A.   No, I do not.

14          MR. MILLER:  All right.  Sorry.  Thank you.

15          THE COURT:  All right.  Thank you, sir, you may

16 resume your seat.

17          NOTE:  The witness stood down.

18          THE COURT:  Mr. Miller, did you want to call any

19 witnesses?

20          MR. MILLER:  No, Your Honor.

21          THE COURT:  Okay.

22          MR. MILLER:  You have the letters that we filed,

23 which is new, we didn't have that before.

24          THE COURT:  Right.

25          MR. MILLER:  So dealing first with the statutory

1  issue.  Originally when the drug statutes were being redone and

2  the Guidelines were coming out and all that --

3          THE COURT:  I don't want to revisit the history of

4  the Bond Reform Act and --

5          MR. MILLER:  It's not the Act.  It's the statute

6  itself.

7          THE COURT:  The statute.  I don't want to revisit the

8  history of the statute.

9          MR. MILLER:  All right.

10          THE COURT:  I want you to tell me if you've got

11  evidence that would convince me that there are conditions of

12  release that are appropriate given the presumption and given

13  the facts that were elicited in the hearing before Judge

14  Nachmanoff, which I have every right to review and consider in

15  this new hearing.

16          Go ahead.

17          MR. MILLER:  Right.  For the record, I'm not trying

18  to argue with the Court.  Judge Nachmanoff's order is

19  essentially conclusory as to what he found without making

20  specific fact findings and statements or reasons.  And I just

21  want to make that clear, my position of that on the record.  We

22  can agree to disagree as lawyers and judges sometimes do.

23          Now, insofar as my client is concerned, he has a base

24  of community support that was not available to Judge Nachmanoff

25  that is strong.  And they are stable individuals.

1    He had then and he has now a place to live with his

2   brother Phillip who has nothing to do with anything to do with

3   this case and works at the car dealership, has been dealing

4   with car businesses for a long number of years.

5    He has no convictions on failures to appear.  He is

6   not someone where there is any reliable information about him

7   ever having -- or there is no allegation about him making a

8   sale to somebody or receiving drugs from anybody.

9    His relationship that has been asserted regarding the

10  Reccless Tigers is, by itself, not a basis to say there are no

11  conditions of release.  And that is the strongest evidence the

12  Government has, is that he is associated with the Reccless

13  Tigers.  But he is not charged with that as an offense.  It's a

14  drug case.

15    And there is a ledger that he didn't write.  There is

16  no evidence that he did write it.  Or when it was, or how old

17  it was, or who put it there, or what it means.  Even if you

18  accept what it means, it's still not something that was his.

19  And there is a lock, and he didn't have the key.  And it wasn't

20  found anywhere in any place associated with him despite the

21  searches for it.

22    So there does not need to be, as the case law says, a

23  guarantee.  And you've got the Jackson case.  And in Jackson I

24  think it might have been the Outlaws, not the Hells Angels

25  motorcycle gang.  And the drug manufacturing was

1   methamphetamine.  And Jackson was out under terms and

2   conditions, and he honored them.

3          In Shimorango the guy was on video in the days of

4   super radical anti-war stuff in the '70s about don't get

5   caught, don't have any connections, be ready to flee all the

6   time, and all kinds of things like that, and he was still

7   released and he honored his conditions.

8          So if he's under electronic home detention with GPS

9   and can't go anywhere except to his lawyer's office, or to

10  court, or things like that, living with a brother who is a

11  straight guy, and there is no question about that, in a case

12  where there are allegations about him and the podcast and

13  violence, but nothing happened.

14         So he's a guy that's been in bar fights.  I've known

15  lawyers, when they get drunk, watch out, because they're nasty.

16  And when they're sober, you'd have no clue that that's the same

17  person if you hadn't seen them in college or when they were out

18  some place in certain situations.  I have been to conferences,

19  as have we all, where somebody, one of our colleagues, the

20  night between the morning session and the next day session gets

21  blasted and goes a little wacko.  But that doesn't mean they

22  are a risk of flight or going to harm anybody.

23         And there has been no harm against anyone where there

24  was a claim of this is what I'm going to do and I'm not going

25  to forget.  That just hasn't happened.  So that is not a fact.

1           And if he is going to be under electronic home

2    detention and he's going to be living with his brother, who is

3    willing to comply with what the Court wants, and he has a

4    community network that stands behind him that is not connected

5    to this case at all, then we're in a situation where we have

6    someone who can be released and be monitored and the community

7    is in a safe situation.

8           Because if he was really as dangerous as that was

9    portrayed, then something would have happened in the violence

10   action related to his uncle.  And it didn't happen.  It never

11   happened.  And there is no allegation of it.  Not even the

12   speculation of an allegation of it.

13          So all of those things combined and assembled

14   together establish that there is a reasonable basis -- because

15   the statute gives you open-ended carte blanche to do just about

16   anything to assure his appearance, and there is no danger to

17   the community.

18          And he can't prove to you that there is a guarantee,

19   but he can prove to you that the community supports him.  He

20   can prove to you that he has a legitimate safe place to live.

21   He has somebody willing to give him a job in a nail salon in

22   Falls Church.  And they are putting their business out there

23   because if he's working in the salon, it's not like you're

24   working in a back office, it's his face and his presence, they

25   are risking their business on it.  And they are willing to do

1  that.

2          So if you take all of those things in combination,

3  you can't say that there are no conditions that wouldn't be

4  set.

5          THE COURT:  All right, thank you.

6          Ms. Cuellar.

7          MS. CUELLAR:  Your Honor, I don't know that much more

8  needs to be said in addition to our filing.  There is a

9  rebuttable presumption in this case.  Two courts have detained

10  the defendant.  He has a criminal history.  Four times he has

11  failed to appear.  Whether convicted or not, he did not show up

12  on the dates of those appearances.  He has continued to engage

13  in criminal conduct after convictions.

14          The people whose letters he has offered have known

15  him during the time period when he has been convicted and

16  committed crimes and when he has been a part of this

17  conspiracy.

18          It is not the case that his brother has no connection

19  at all to gang activity.  His brother has been connected to

20  gang activity.  His brother has also received from the

21  defendant $25,000 in cash transfers --

22          MR. MILLER:  Objection, Your Honor.  That's not --

23          MS. CUELLAR:  Well, it certainly was testified to at

24  the hearing before Judge Nachmanoff, that the defendant

25  transferred over $800,000 of cash proceeds.  He has no job,

1  Your Honor.  And some of those proceeds went to his brother.

2          So when you consider the fact that the defendant in

3  the part of the podcast that was played in court avowed his

4  allegiance to the Asian Boyz, who are a violent gang in Los

5  Angeles, and to Tiger Side, which is a part of the Reccless

6  Tigers, it is one of the subordinate elements of the Reccless

7  Tigers, you consider his criminal history, you consider the

8  overwhelming evidence that has led to his charges in this

9  case -- Mr. Miller keeps saying it's speculation.  The evidence

10 is alleged in the filing, and it was testified to at the

11 detention hearing.  It was also presented to the grand jury,

12 and there is an indictment.

13         So there is at least probable cause at this point to

14 establish the defendant's guilt of the conduct, which is all

15 that is needed for a bond determination, Your Honor.

16             THE COURT:  All right, thank you.

17             MR. MILLER:  Your Honor, may I briefly?

18             THE COURT:  Yes, briefly.

19             MR. MILLER:  Yes.  He had a vaping business.  And

20 that is, as anyone one reads the newspaper these days knows,

21 highly profitable with --

22             THE COURT:  Three months he had a business?

23             MR. MILLER:  No, he had it for a couple years.

24             THE COURT:  In California or here?

25             MR. MILLER:  It was basically mail order.  And he had

1    a shop here for a while, they closed the shop, and it was mail

2    order for a while, and then that closed down.

3            THE COURT:  Okay.

4            MR. MILLER:  So it's not like he was doing nothing.

5            And there are two different groups.  There are the

6    Reccless Tigers, is the one with which they claim he is

7    associated, but the mere gang membership in and of itself is

8    not -- the mere fact that somebody is charged with not having

9    appeared in court does not mean that they violated a court

10   order.  People in Maryland get notices sent by the court so

11   they know where to go.  Fairfax doesn't do that.  And other

12   Northern Virginia jurisdictions don't.  This court would let

13   somebody know in writing.

14           So the fact that there were no findings that he

15   violated the rules is significant.

16           THE COURT:  Okay, thank you.

17           This is not a close case.  The Government has

18   demonstrated at the hearing before Judge Nachmanoff, and

19   through the Pretrial Services investigation, and now here today

20   with the additional evidence, that Mr. Huynh is heavily vested

21   in drug dealing and in gang activity, and dangerous gang

22   activity.

23           He has got a violent history.  Multiple convictions

24   for felony drug sales, misdemeanor drug possession, assault on

25   a police officer, resisting arrest, carrying a knife, multiple

1   fights.  The FBI witnessed him beating somebody with a baseball

2   bat.  He has run nearly a million dollars through accounts in

3   the last three years, and multiple trips to different

4   locations.

5            He has been now indicted on a ten-year minimum

6   mandatory offense.  And whether convicted or not of the

7   failures to appear, one time failing to appear, that might be

8   something I would look at.  Four is not a coincidence that he

9   has been charged four times.

10            So I don't find the evidence that he could go live

11   with his brother and be on electronic monitoring comes close to

12   conditions that would satisfy the statute and make him either

13   no longer a danger to the community or a risk of flight.  I

14   think he is both.  And that there are no conditions.

15            So your motion for conditions of release is denied.

16            MR. MILLER:  All right.  Your Honor, there was

17   another issue that we were going to address today that came up

18   at the arraignment, and I advised the Government of this

19   yesterday.

20            We were going to let the Court know whether or not he

21   was able to retain me.  And I found yesterday that they can't

22   afford to get me in the case.  And I let the Government know.

23            And I told -- reminded Ms. Cuellar that I would be

24   advising the Court about that today.  So he is going to need to

25   have some counsel appointed to represent him.  And he and I

1    have discussed that, but I promised you that I would let you

2    know today.  And I am now doing that.

3              THE COURT:  All right.  I had forgotten that.  Thank

4    you for doing that.  All right.

5              MS. CUELLAR:  Your Honor, I prepared a conflicts list

6    for the Court.

7              THE COURT:  That is very helpful.

8              All right, Mr. Huynh, we'll appoint counsel for you

9    and they will be in touch shortly, sir.

10             All right.  Anything else this morning?

11             MS. CUELLAR:  No, Your Honor.

12             MR. MILLER:  No, Your Honor.  And I take it I'm

13   relieved of my --

14             THE COURT:  You are, you are relieved.

15             MR. MILLER:  Thank you, Your Honor.

16             THE COURT:  Thank you, sir.

17             MS. CUELLAR:  Thank you, Your Honor.

18        -------------------------------------------------
                         HEARING CONCLUDED
19

20

21

22             I certify that the foregoing is a true and
          accurate transcription of my stenographic notes.
23

24             /s/  Norman B. Linnell
          _____
          Norman B. Linnell, RPR, CM, VCE, FCRR
25